UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-----------------------------X

UNITED STATES OF AMERICA,

    -Against-           No. 3:05-cr-58 (SRU)

RAFAEL ALMONTES.

-----------------------------X

### DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SENTENCE REDUCTION, EXPEDITED CONSIDERATION, APPOINTMENT OF COUNSEL, AND FOR ORAL ARGUMENT ON MOTION

Rafael Almontes, Pro Se
16296-014
Federal Correctional Institution
33.5 Pembroke Road
Danbury, Ct 06811

# TABLE OF CONTENTS

PAGE

INTRODUCTION ..................................................1

FACTUAL BACKGROUND ...........................................1

DISCUSSION ...................................................8

A. The Court Has Jurisdiction to Grant Release for
   Extraordinary and Compelling Reasons ....................8

B. The Relief Requested is Consistent With the Text of the
   Statute and the Sentencing Commission's Policy Statement ...9

   1. Congress Did Not Limit "Extraordinary and Compelling
      Reasons to a Specific Set of Circumstances ...........9

   2. The U.S. Sentencing Commission Has Not Limited
      "Extraordinary and Compelling Reasons" for Release to
      Medical, Age-Related, or Family Circumstances .........11

   3. Extraordinary and Compelling Circumstances Warrant a
      Reduction in Almontes' Sentence .....................15

C. The Criteria For Reassessing The Length Of Almontes'
   Sentence Weigh Strongly In Favor Of Reduction ..........20

   1. Almontes Is Not A Danger ...........................20

   2. The § 3553(a) Factors Strongly Favor Relief .........21

D. Almontes Is Deserving Of Mercy .........................24

CONCLUSION ..................................................26

VERIFICATION ................................................26

Rafael Almontes, the pro se Defendant, submits this memorandum in support of his motion to (1) reduce his sentence to time served based on the "extraordinary and compelling" reasons discussed below (2) expedite consideration due to the urgency of his medical needs (3) appoint counsel and (4) permit oral argument on this motion.

## INTRODUCTION

Almontes was sentenced in 2006 by this Court to a 262-month term of imprisonment for a drug conspiracy he participated in when he was in his early thirtys, and for possession of a firearm in furtherance of that conspiracy. Almontes has already served over 201 months of that term (177 months jail time and 24 months good credit time earned).

On October 15, 2019, Almontes submitted a written request to Warden M. Lincon-Vitale asking that the Bureau of Prisons "BOP" move this Court for a reduction of Almontes' sentence under 18 U.S.C. § 3582(c)(1)(A)(i). Exhibit 13. As of the date of this filing, no such motion has been made.

Thanks to the amendments to § 3582(c)(1)(A) that were enacted as part of the First Step Act, the Court is now empowered to bring a measure of justice to Almontes' sentence, and we ask the Court to do just that for the reasons set forth below. See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018).

## FACTUAL BACKGROUND

In 2005, Almontes was indicted for conspiring to possess with intent to distribute 50 grams or more of cocaine base and 5 kilograms or more of cocaine powder. ECF# 419 (Indictment, Count 1). According to the government, the conspiracy was led by Alex Luna and involved "a large scale cocaine and crack distribution ring ... Luna would regularly receive kilogram-sized quantities of cocaine from sources of supply based in New York City. After receiving this cocaine, Luna and his close associates ... would meet in various hotels in the Danbury area to process and package the cocaine for street sale. Luna and his associates would then distribute the cocaine to other individuals [including Almontes] for street-level distribution." ECF# 789 (Gov't Sent. Mem. p. 2).

On October 2, 2006, the Court allowed Almontes to speak at his sentencing. Exhibit 1 (Tr.Rec., 10/2/06 Sent. Hr. p. 13-15). Almontes admitted his guilt, accepted responsibility for his conduct, spoke of his remorse for his actions and disgust at himself for what he had done and put his family through, and viewed himself as a "broken man". Id. He recounted his "accident [while] running from the police", which "ended up with a broken neck" from the crash, and he acknowledged how "grateful" and "fortunate" he was "to not only still be alive but" to be able to walk. He stated "sin ma[de him] stupid" and pledged to turn back to God to better himself throughout his incarceration and to "take advantage of everything that will be available to [him], any program that [he could] possibly apply for[, he would] get involved in." Id.

When he was done, the Court stated that "[u]nlike many

2

defendants, [Almontes did] have the intelligence to do something legitimate with [his] life if [he] took advantage of the opportunities [available] in prison". Exhibit 2 (Tr.Rec., 10/2/06 Sent. Hr. p. 23). The Court explained that incarceration would give Almontes "the opportunity for greater educational and especially vocational opportunities within the prison, which" would give him "an advantage coming out" and would "have some training[, and experience[, and] a work record [to] refer to and that should help [Almontes] find a job when [he] get[s] out." Exhibit 2 (p. 27). The Court expressed that its "hope[] that [he]'ll do it." Exhibit 2 (p. 23).

The Court then stated that the sentence called for by the guidelines, "322 months at the bottom" end "is an extremely long sentence" that was "out of whack with [Almontes'] conduct". Exhibit 2 (p. 22-23). The Court concluded that "322 months is longer than necessary ... to serve the purposes of punishment and deterrence and rehabilitation[,]" and "impose[d] a nonguideline sentence[,]" of 262 months. Exhibit 2 (p. 23).

Over the years, Almontes relied on the Court's words at sentencing to influence the decisions he made to better himself during his 15 years of incarceration. For instance, he successfully completed numerous courses covering topics such as VT horticulture, VT culinary arts, MS office, electrical wiring, commercial driving, Internet, computing core, stocks, drug education, numerous fitness and wellness classes, and a 40-hour drug education course. Exhibit 3 (BOP Progress Report). He was also commended for his five years of

outstanding work performance at Unicor at FCI Jesup, Exhibit 4, obtained a Microsoft Office Specialist certification, Exhibit 5, and maintained his religious beliefs and close relationships with his family, friends and the community he will be returned to. As he looks at his post-conviction accomplishments and growth in totality, he sees how the good choices he made during his incarceration have so positively affected the quality of his life in prison, and how that will continue to do so after his release. Had he had this wisdom when he was in his early 30s, he would have made different choices to avoid the harm he brought to his community, family and self.

So while it was an open question at the time of Almontes' October 2006 sentence how he would do in prison, that question has now been answered with a resounding acceptance to the Court's suggestion that he make good choices to better himself to gain substantial advantages for his release in the form of vocational training, occupational experience, and an outstanding work record. Unfortunately, however, all of that may have been for not, as a consequence of a lack of proper medical care by his custodian that has caused the injuries he sustained when he crashed his car at the time of his arrest to develop severe spinal stenosis and myelopathy that may now cause his paralysis.

Following the crash, surgeons operated on Almontes' neck and spinal cord, harvesting bone from other locations in his body to fuse the C1 disk to his brain stem. They inserted hardware (two plates, a rod, and screws) to assist in his recovery. Two years later, he began to feel a numbing

4

sensation in the tips of his forefingers and thumbs and a
pulsating numbness in his shoulder. The numbness later spread
to Almontes' forearm and he loss a significant amount of
strength which seemed to occur literally over night. In 2014
the numbness became quite severe and painful and he requested
medication to manage the pain. It wasn't until 2017 that
Almontes was given pain medication despite years of grievances
through the administrative remedy process for medical
attention.

In June 2018, an MRI was conducted which revealed
Almontes has severe spinal stenosis and spondylolisthesis
which causes spinal cord deformity and myelomacia. Exhibit 6
(Northeast Radiology Report, 6/15/18). Myelomalacia is a
condition in which the spinal cord softens. The softening is
due to an acute injury (e.g., car accident injury). When the
spine softens, the nerves are put at increased risk. In
August 2018, a spinal specialist determined Almontes now has
Cervical myelopathy and was in urgent need of surgery to
relieve the compression in his spinal cord, and a second
surgery to rearrange the hardware in my neck and spinal cord
to stabilize my spinal cord. Exhibit 6 (OrthoConnecticut
Report, 11/28/18). The specialist expressed the severity of
the matter stating that any delay in obtaining the necessary
surgery would compromise his prospects for a recovery without
permanent spinal damage that can lead to paralysis. In fact,
the specialist stated that if Almontes was notschackled he
would have performed the surgery right then. Consequently,
the prison system's prolonged indifference to his medical care
needs over the term of his incarceration has caused his

5

condition to substantially worsen, placed him at an abnormally high risk that the unattended severe spinal stenosis and myelopathy will now result in paralysis, and subjected him to live with unnecessary pain, numbness, loss of mobility throughout his left arm and hand, and loss of strength.

In August 2019, pursuant to § 404 of the First Step Act, the Court reduced co-defendant Bobby Medina's sentence to time served, after his having completed 14 years of his original 24 year sentence. While Almontes' involvement in the Luna organization was found by the Court as a mere "street level involvement", Exhibit 2 (p. 24), Medina was "the right-hand man of Mr. Luna" who "r[an] the organization on a day-to-day basis for Mr. Luna". Exhibit 8 (US v Medina, 05-cr-58, Tr.Rec., 8/12/19 Sent. Hr. p. 18). Thus, as it stands today, the co-leader of the Luna organization, whose culpability and role in the offense was substantially greater than Almontes', ultimately received a sentence substantially less than Almontes'.

Earlier this year, Almontes sought to file a similar § 404 motion for sentence reduction as the one filed by Medina, but was told by his then appointed counsel that he was not eligible because, although the conspiracy he pled guilty to involved the production and sale crack cocaine from cocaine powder, the information he pled guilty to did not expressly list crack cocaine. Exhibit 9 (Fed. Def. Letter, 4/3/19). This technicality is unfair, given that Almontes' offense conduct involved both powder and crack cocaine. Indeed, at Medina's August 2019 sentencing, the government maintained its long standing position that the Luna conspiracy "was an

6

organization that sold powder and crack cocaine", Exhibit 8
(p. 12), and that "substantial quantities of powder cocaine
... was cooked into crack cocaine and sold." Exhibit 8 (p.
17). Moreover, the PSR prepared for Almontes' 2006 sentence
contains excerpts of wiretap recordings between Almontes and
Luna, where Almontes states he received "two balls, the rock
one from Juan G" meaning crack cocaine and "need[ed] the soft
now" meaning powder cocaine. See PSR (p. 7 at ¶ 27).

As noted above, on October 15, 2019, Almontes submitted
an application to the Warden at the institution he is
incarcerated at requesting that the BOP move this Court for a
reduction in sentence. As of the date of this filing - more
than 30 days after Almontes made his written request to the
warden - the BOP has not filed a motion on Almontes' behalf
with the Court.


                            DISCUSSION


The Court now has the authority to reduce Almontes'
sentence based on the extraordinary and compelling
circumstances presented here. First, it has the jurisdiction
to hear this motion because more than 30 days have passed
since the warden received Almontes' request, and the Director
of the BOP has not filed a motion with this Court. Second,
the changes to 18 U.S.C. § 3582(c)(1)(A)(i) made by the First
Step Act have finally vested the Court with the authority to
decide when extraordinary and compelling circumstances warrant
a sentence reduction. Third, the circumstances presented here
warrant a sentence reduction.

## A. The Court Has Jurisdiction to Grant Release for "Extraordinary and Compelling Reasons"

The compassionate release statute was first enacted as part of the Comprehensive Crime Control Act of 1984. It provided that a district court could not modify a final term of imprisonment except in four situations, one of which was the existence of "extraordinary and compelling reasons" warranting the reduction, as determined by the sentencing court. But although the courts had the final decision-making authority over whether a sentence would be reduced, the statute imposed a gatekeeper - that authority could be invoked only upon a motion by the Director of the BOP. Without such a motion, sentencing courts were powerless to reduce a prisoner's sentence, even if the court concluded that extraordinary and compelling reasons warranted the reduction. 18 U.S.C. § 3582(c)(1)(A)(i); see also P.L. 98-473, 98 Stat 1837 (Oct 12, 1984).

That changed when Congress enacted the First Step Act, which amended § 3582(c)(1)(A). See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Under the amended statute, a court can now reduce a sentence for "extraordinary and compelling reasons" in two circumstances: (i) if the Director of the BOP files a motion requesting such relief; or (ii) "upon motion of the defendant," if the defendant has fully exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if 30 days has elapsed "from the receipt of such a request by the warden of the defendant's

facility," whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).
See also US v Cantu, No. 1:05-cr-458-1, 2019 WL 2498923, at *3
(S.D. Tex. June 17, 2019)("[u]nder the newly amended § 3582(c)
(1)(A) [the defendant] has standing to bring this motion
because more than 30 days elapsed between his reduction-in-
sentence request to the warden and a response."); US v Cantu-
Rivera, No. CR HR-89-204, 2019 WL 2578272, at *1 (S.D. Tex.
June 24, 2019)(defendant's "petition ... meets the requirement
of a lapse of 30 days from the receipt by the warden of the
defendant's facility ... The Court therefore has the authority
to address the motion of the defendant."). As noted above,
Almontes submitted his request to the warden on October 15,
2019. As of the date of this filing, more than 30 days after
Almontes submitted his request, the BOP has not filed a motion
with this Court on Almontes' behalf. Accordingly, Almontes is
entitled to bring his motion directly to the Court pursuant to
18 U.S.C. § 3582(c)(1)(A), and this Court is vested with the
jurisdiction to rule on the requested relief.

### B. The Relief Requested is Consistent with the Text of the Statute and the Sentencing Commission's Policy Statement

### 1. Congress Did Not Limit "Extraordinary and Compelling Reasons" to a Specific Set of Circumstances

Congress did not define what would constitute an
"extraordinary and compelling reason" warranting a reduction
of a sentence under § 3582(c). Indeed, the legislative
history confirms that it intended to grant federal sentencing

courts broad discretion to make those determinations on a case-by-case basis, and to reduce fundamentally unfair sentences where such reasons exist.

Congress' initial goal in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53 n.74 (1983). But with the elimination of parole as a corrective measure in cases where early release is warranted, Congress recognized the need for an alternative process. It therefore allowed for judicial reduction of certain sentences under § 3582(c):

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentence guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

Id. at 55-56 (emphasis added). Put differently, rather than having the Parole Commission review every federal sentence, Congress decided to let sentencing courts decide, in a far narrower band of cases presenting extraordinary and compelling circumstances, if "there is justification for reducing a term of imprisonment." Id at 56.

The situations listed in § 3582(c) were thus intended to serve as "safety valves for modification of sentences," enabling sentence reductions when justified by factors that previously could have been addressed through the (now abolished) parole system. Id. at 121. This approach was intended to keep "the sentencing power in the judiciary where

it belongs," rather than with a federal parole board, and permitted "later review of sentences in particularly compelling situations." Id. (emphasis added). Notably, Congress imposed no limitations on courts' authority to make such determinations, declining to define what constitutes "extraordinary and compelling reasons" or to otherwise constrain judges' discretion. The mandate was simple: If extraordinary and compelling reasons were present, they would "justify a reduction of an unusually long sentence." S. Rep.No. 98-225, at 55-56 (1983).

Unfortunately, the establishment of the BOP as a gatekeeper effectively eliminated the safety valve. The BOP, which is of course part of the Department of Justice, hardly ever opened the gate.[1] As a result, Congress, through the First Step Act, allowed direct access to the sentencing court once an inmate's request to the BOP has been exhausted.

## 2. The U.S. Sentencing Commission Has Not Limited "Extraordinary and Compelling Reasons" Release to Medical, Age-Related, or Family Circumstances

When enacting § 3582(c), Congress delegated the responsibility for expounding upon what constitutes "extraordinary and compelling reasons" to the U.S. Sentencing

---

[1] See e.g., The Answer is No: Too Little Compassionate Release in US Federal Prisons, Human Rights Watch, 2 (Nov. 2012), https://www.org/sites/default/files/reports/us1112 ForUploadSm.pdf (noting that between 1992 and 2012, the average number of prisoners who received compassionate following a motion by the BOP was less than two dozen).

Commission (the "Commission"). See 28 U.S.C. § 994(t) ("The Commission ... shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); see also 28 U.S.C. § 992(a)(2)(the Commission shall promulgate general policy statements regarding "the sentence modification provisions set forth in section[] ... 3582(c) of title 18"). The resulting policy statement by the Commission sets forth the following factual considerations: (i) the medical condition of the defendant (including terminal illness and other serious conditions and impairments); (ii) the age of the defendant (for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment); (iii) the family circumstances of the defendant (where the caregiver of the defendant's child[ren] dies, or where the defendant's spouse becomes incapacitated without an alternative caregiver); and (iv) "other reasons" as determined by the BOP. U.S.S.G. § 1B1.13, Application Note 1(A). The fourth category specifically includes "an extraordinary and compelling reason other than, or in combination with," the first three. Id. Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, Application Note 2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not

12

preclude consideration for a [sentence] reduction." Id.

As the above language makes clear, extraordinary and compelling reasons for a sentence reduction may exist even when an inmate is not elderly, ill, or facing complicated family circumstances. And though the policy statement - which has not been amended since the passage of the First Step Act - vests the Director of the BOP with authority to determine when such "other reasons" might warrant a reduction in a particular case, that language is now irreconcilable with the revised statute, which permits a defendant to bring a § 3582 motion to the Court without any response from the BOP or even if the BOP expressly decides that no reasons warrant a reduction in sente nce. Accordingly, that aspect of the commentary is not binding on the courts for two reasons: (1) the Guidelines are advisory only, see United States v Booker, 543 U.S. 220 (2005); and (2) it is inconsistent with the text and undisputed purpose of the First Step Act. See United States v Da Cai Chen, 127 F.3d 286, 191 (2nd Cir 1997) (commentary that relates to a statute, or to a guideline that mirrors a statute (as here), is not entitled to deference); see also United States v Pierninanzi, 23 F.3d 670, 683 (2nd Cir 1994).

Indeed, multiple district courts, since the passage of the First Step Act, have observed that § 1B1.13 "has not yet been updated to reflect that defendants (and not just the BOP) may move for compassionate release," United States v McGraw, No. 2:02-cr-00018 (LJM) (CMM), 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019), and "[b]ecause the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provision must be given effect."

Cantu-Rivera, 2019 WL 257872 at *2 no.1.  See also Cantu, 2019 WL 2498923 at *4 ("Given the changes to the statute, the policy statement that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of the sentence-modification provisions under § 3582."); United States v Sotelo, 2019 U.S. Dist. Lexis 135051 (D. Pa. Aug. 8, 2019)("This policy statement [meaning USSG § 1B1.13] is now inconsistent with the First Step Act's amendment of § 3582(c)(1)(A), allowing courts to grant sentence reductions despite potentially contrary Bureau of Prisons determinations.").

The Court's authority to reduce Almontes' sentence is not only consistent with the statute, but also with the language in the policy statement, which makes clear that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of the reduction)" and encouraging the filing of a motion for compassionate release where a defendant "meets any of the circumstances set forth in [the] Application Note."  As mentioned above, in amending the language of 18 U.S.C. § 3582(c)(1)(A), Congress finally empowered courts to make this critical determination, even in the face of a BOP determination that a defendant's case is not extraordinary and compelling.

Thus, just a few months ago, a district court in Texas held as follows:

> [T]he correct interpretation of § 3582(c)(1)(A)-
> based on the text, statutory history and structure,
> and consideration of Congress's ability to

override any of the Commission's policy statements
'at any time' [...]- is that when a defendant
brings a motion for sentence reduction under the
amended provision, the Court can determine whether
any extraordinary and compelling reasons other
than those delineated in U.S.S.G. § 1B1.13 cmt.
N.1 (A)-(C) warrant granting relief.

Cantu, 2019 WL 249823 at *5. This Court therefore may make an

independent assessment of Almontes' case in considering

whether extraordinary and compelling reasons warrant the

reduction of his sentence.[2]

## 3. Extraordinary and Compelling Circumstances Warrant a
## Reduction in Almontes' Sentence

---

2- See Cantu, 2019 WL 2498923, at *4 ("Given the changes
to the statute, the policy statement provision that was
previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer
fits with the statute and thus does not comply with the
congressional mandate that the policy statement must provide
guidance on the appropriate use of sentence-modification
provisions under § 3582."); Cantu-Rivera, 2019 WL 2578272,
at *2 n.1 (finding authority to determine that defendant
was entitled to relief under the catch-all provision in
the commentary to § 1B1.13 because the "current policy
statement predates the enactment of the First Step Act
and is not likely to be amended within the foreseeable
future due to lack of a sufficient number of serving members
of the Sentencing Commission."); US v Beck, No. 1:13-CR-186-6,
2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019)("While the old
policy statement provides helpful guidance, it does not
constrain the Court's independent assessment of whether
'extraordinary and compelling reasons' warrant a sentence
reduction under § 3582(c)(1)(A)(i)."); U.S. v Sotelo, 2019
U.S. Dist. Lexis 135051 ("Applying the rule of lenity and
giving preference to the most recently enacted statute, we may
now find a sentence reduction is warranted without the [BOP's]
initial determination, and we will not be acting inconsistent
with the Sentencing Commission's policy statements."); U.S. v
Urkevich, 1:13-CR-186, 2019 WL 6037391 (D. Neb. Nov 14, 2019)
(agreeing with "other courts [that] have concluded that the
Commission's failure to amend USSG § 1B1.13 does not preclude
a court from acting on motions [] using the catch-all
provision in Application Note 1(D)" to USSG § 1B1.13).

First, Almontes' Medical Condition and BOP's History of
Indifference to His Medical Care: Defendant entered prison
with a significant injury top his neck and back after he
crashed his car in an attempt to evade law enforcement at the
time of his arrest. During his 14 years of incarceration, a
lack of proper medical care by his custodian caused his
injuries to develop into severe central spinal stenosis with
cord deformities at the C4-C5 and C5-C6 disk levels with
myelopathy. Exhibit 6. Over 1 year ago, a spinal specialist
advised that he was in imminent danger of permanent damage to
his spinal cord and bone marrow which required urgent surgery,
and that any delay would compromise his prospects for a
recovery without permanent spinal damage that can lead to
paralysis. Exhibit 14.

Given this information, the course of action by the
prison system in responding to his urgent need for surgery,
punctuated by repeated delays in care, has been grossly
inadequate, causing his condition to substantially worsen to
the point where examinations now reveal signs of myelopathy
which causes irreparable paralysis. Exhibits 7 & 10 (Medical
Article on Spinal Stenosis, by John H. Shim, MD). The delays
in treatment have placed him at an abnormally high risk that
the unattended severe spinal stenosis and myelopathy will now
result in paralysis, and subjected him to live with
unnecessary pain, numbness, loss of mobility throughout his
left arm and hand, and loss of strength.

The prison system's indifference to Almontes' severe
spinal stenosis, myelopathy, and ensuing unnecessary pain and

symptoms has likely reached the level of a constitutional violation, poses an unacceptable risk to his health, and constitutes an extraordinary and compelling circumstance to warrant a reduction in sentence under USSG § 1B1.13, n.1(D). See United States v Beck, 2019 WL 2716505 (finding BOP's history of indifference to defendant's medical treatment constitutes extraordinary and compelling reasons under U.S.S.G. § 1B1.13 n.1(D) and 18 U.S.C. § 3582(c)(1)(A)(i) to grant compassionate release.)

Second, Fundamental Change in Sentencing Policy and Unfairness to Defendant: Almontes was indicted for conspiring to possess with intent to distribute 50 grams or more of cocaine base and 5 kilograms or more of cocaine powder in connection with a large-scale cocaine and crack distribution ring in the Danbury area led by co-defendants Alex Luna and Bobby Medina. ECF# 789 (Gov't Sent. Mem. p. 2). While he pled guilty to a subsequent substitute information that did not expressly charge crack cocaine ECF# 476, he nevertheless pled guilty to the conspiracy led by Luna and Medina, which the government itself, even after his conviction continued to allege involved both crack and cocaine. ECF# 789 (Gov't Sent. Mem. p. 2). On appeal, his defense counsel argued before that Court that Almontes "was convicted ... of conspiracy to possess with intent to distribute cocaine base ...", Exhibit 11 (Almontes Appellate Brief, p. 1), and neither the government, nor that Court, disputed his contention that his offense of conviction involved crack.

This is significant because pursuant to § 404 of the First Step Act ("FSA"), on August 12, 2019, the Court reduced

co-defendant Medina's 24 year sentence to time served, after his having completed approximately 14 years of that sentence. At his resentencing, the government maintained that the Luna/Medina organization "was an organization that sold powder and crack cocaine", Exhibit 8 (p. 12), that "substantial quantities of the powder cocaine ... was cooked into crack cocaine and sold[,]" Id. (p. 17), but that Medina was not eligible for resentencing under § 404 of the FSA, because "Medina didn't admit to crack cocaine" and therefore the Court "can't consider that this is a crack case." Id. (p. 19). The Court rejected the government's contentions, and concluded Medina was eligible for an FSA reduction because the Luna/Medina organization involved "a crack case[,]" Id (p. 19).

Notwithstanding the foregoing, Almontes was told by his court appointed counsel that he is not eligible for a § 404 FSA reduction, because, although the conspiracy he pled guilty to involved the production and sale of crack cocaine from cocaine powder, the subsequent information he pled to did not expressly list crack cocaine. ECF# 476.

This technicality under § 404, which produces unfairness to Almontes in the circumstances of this case, provides extraordinary and compelling reasons to warrant a sentence reduction under § 3582(c)(1)(A)(i) as amended by the FSA. This is especially so given that Almontes is now left with a sentence that is substantially longer than Medina, who was the co-leader of the Luna/Medina organization, who according to th e government "r[an] the organization on a day-today basis", Exhibit 8 (p. 18), and whose severity of his offense was

calculated by the guidelines at the time of his original "at life imprisonment, not a range, life imprisonment." Exhibit 12 (US v Medina, 05-cr-58, Tr.Rec., 8/12/19 Sent. Hr. p. 36). Whereas, Almontes' involvement in the organization, as found by the Court, was a mere "street level involvement[,]" and his severity under the guidelines was calculated at 322 to 377 months. Thus, based on role and offense severity, Almontes is deserving of a far lesser sentence than Medina.

Unfairness also exists due to the prison system's mismanagement of Almontes' medical care that has caused him to serve much of his sentence while seriously ill, and in physical pain, with ongoing numbness, loss of mobility and strength, and now abnormally high risk of irreparable injury, including paralysis, which will cause an immeasurable harm for the remainder of his life. "This means that [Almontes'] sentence has been significantly more laborious than that served by most inmates." United States v Beck, supra.

Third, Exceptional Record of Post-Conviction Rehabilitation: Despite receiving a sentence of 262 months, Almontes followed the Court's sentencing advice and made good choices while incarcerated to establish an exceptional record of post-conviction rehabilitation. In this regard, he successfully completed numerous courses, which covered topics such as VT horticulture, VT culinary arts, MS office, electrical wiring, commercial driving, Internet, computing core, stocks, drug education, and numerous fitness and wellness classes. Exhibit 3. He also completed a 40-hour drug education course, Id., earned recognition for his five years of outstanding work performance at Unicor at FCI Jesup

(Exhibit 4), and obtained a Microsoft Office Specialist
certification. Exhibit 5; see also United States v Cantu-
Rivera, 2019 WL 2578272 (the court considered defendant's
post-conviction rehabilitation, in combination with the
fundamental changes to sentencing policy carried out in the
FSA, and sentencing disparities among defendants, established
extraordinary and compelling reasons justifying a reduction in
sentence under § 3582(c)(1)(A)(i)).

## C. THE CRITERIA FOR REASSESSING THE LENGTH OF ALMONTES' SENTENCE WEIGH STRONGLY IN FAVOR OF A REDUCTION

In determining whether Almontes' sentence should be
reduced, the court must decide, inter alia, whether Almontes
presents a danger to the safety of any other person or to the
community, as provided in 18 U.S.C. § 3142(g). U.S.S.G. §
1B1.13(2). If he does not, the Court looks to the factors
outlined in 18 U.S.C. § 3553(a). As explained below, all of
the factors weigh strongly in favor of Almontes' release.

### 1. Almontes Is Not a Danger

Almontes is not a danger to the community. Though he
engaged in serious criminal conduct that was deserving of a
serious punishment, the evolution of Almontes' character in
the nearly 15 years he has been incarcerated, increased age
and maturity (46 years) severe health issues, need for medical
care, and high probability of permanent injury which may
result in permanent paralysis, provides sufficient evidence
showing that his release at this time poses no danger to any
other person or the community. See e.g., US Sent Comm.,

Measuring Recidivism, 2004 ("Recidivism rates decline relatively consistently as age increases", reaching a low percentage of 6.9% for defendants whose age exceeds 40 years by the time they are released.); see also US Dep't of Justice, the "Federal Bureau of Prisons, Compassionate Release Program:, April 2013 (finding recidivism is extremely rare among compassionate release inmates). Indeed, at the original sentencing, the Court determined that Almontes was "older than most defendants we see who have been convicted of these claims and, therefore, [he would] be well past the age when I'm concerned about recidivism when [he's] released." Exhibit 2 (p. 23)

## 2. The § 3553(a) Factors Strongly Favor Relief

This Court must next weigh the factors set forth in 18 U.S.C. § 3553(a) to determine whether Almontes' request for a sentence reduction should be granted. As discussed above, Almontes' medical condition and the BOP's history of indifference to his medical care needs, together with the fundamental changes in sentencing policy and unfairness to Almontes, along with his rehabilitation and good behavior during his incarceration (with minimal disciplinary history) weighs in favor of a reduced sentence. While his crimes were serious, he has accepted responsibility for them and has already endured serious punishment for them, as evidenced by the disparity between his sentence and co-defendant Medina, the co-leader and person who ran the organization on a day-to-day basis.

The nearly 15 years Almontes has already served in prison have been transformative for him. He has dedicated himself to the rehabilitation of himself, personifying the objectives of § 3553(a)(2) that incarceration "provide the defendant with needed educational or vocation training, medical care, or other correctional treatment." There is no doubt that the time Almontes has already served is more than sufficient to achieve the objectives of his sentence and incarceration, including to deter similar misconduct.

In the case of someone who is not receiving adequate medical care, and may therefore suffer permanent paralysis as a result, a sentence of imprisonment "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispose harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall v United States, 552 US 38, 53 (2007).

Moreover, because Almontes has served the entirety of his sentence with significant injuries, and because BOP has repeatedly mismanaged his care, including delaying medical procedures for so long that corrective surgery may no longer be effective to reduce the probability of permanent paralysis, his "sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in [his] condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)." US v Beck, 2019 WL 2716505.

The nearly 15 years Almontes has already served is also more than sufficient "to protect the public from further crimes of the defendant", § 3553(a)(2)(C), given his record of

post-conviction rehabilitation and good conduct, together with increased age and maturity (46 years) severe health issues, need for medical care, and high probability of permanent injury which may result in permanent paralysis. This is further supported by the Mishoe decision, which acknowledges a need to have incrementally proportionate punishment, where Almontes has already served a term of imprisonment that is more than 5 times as long as the longest sentence he ever previously served, and the level of his involvement in this case was a street level involvement. See Exhibit 2 (p. 23-24); see also US v Mishoe, 241 F.3d 214 (2nd Cir 2001).

Finally, this Court should consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6); see also Cantu-Rivera, 2019 WL 2578272, at *2 (finding a reduced sentence would "also avoid unwarranted disparities among defendants with similar records convicted of similar conduct" because defendant's time served "exceeds the sentences imposed on other members of the drug-trafficking conspiracy."). This fact, too, weighs strongly in favor of a sentence reduction for Almontes. As noted above, there is disparity between Almontes and Medina, who has already been released from prison. And the disparity is particularly unjust given that Medina was the co-leader who ran the organization on a day-to-day basis, whereas Almontes' involvement was merely that of a street level involvement, and Medina engaged in substantially more culpable conduct than Almontes and because of that had a guidelines calculation of life imprisonment.

## D. Almontes Is Deserving of Mercy

With the passage of the First Step Act, Congress emphasized the imperative of reducing unnecessary incarceration and avoiding unduly punitive sentences that do not serve the ends of justice. United States v Simons, No. 07-CR-00874, 2019 WL 1760840, at *8 (E.D.N.Y. Apr. 22, 2019). Almontes' conduct and initiative during his incarceration demonstrate rehabilitation. He has spent his time in prison improving himself, has had no major disciplinary infractions, and has continued to work towards gaining educational and occupational advantages for himself for when he is released. He has demonstrated an unwavering commitment to becoming a productive member of society if released through his years of vocational courses and training. But all of that has been placed at risk by the BOP's repeated mismanagement of his medical care that may now result in his permanent paralysis.

If released, Almontes will live with his sister Nancy Almontes and her husband at their family home n Middlebury, Ct. Nancy and Almontes other brothers and sisters have repeatedly expressed that they are ready and willing to support Almontes as he rebuilds his life, and most importantly, to help him locate and obtain the urgent medical surgery he needs, obtain and pay for health insurance for those costs, and care for him during his recovery and rehabilitation. To the extent he is able to work after his recovery, Almontes brother-in-law has offered him office work employment with his company that would include continuing

24

health insurances and a means to support himself. All of Almontes' family members combined have offered to provide him with the remaining transportation, financial, moral, and familial support to help him transition back to the community. Almontes' family members will provide any documentation necessary to verify the foregoing, or testify to the same at a hearing if requested by the Court, US Probation, or any appointed counsel in this matter. Exhibits 15 & 16.

When Almontes was sentenced in 2006, less than two years after Booker, this Court was still sorting out what a fair sentence was in a drug context, and what non-Guideline sentencing meant. Exhibit 12 (p. 36). Since then a lot has changed. Almontes has changed for the better, his medical issues have changed for the worse, and the public's sense of what is a fair sentence in a drug context has changed. Id. (p. 36-37) We are not in 2006 anymore. Id. And probably one of the biggest changes is that the Court now knows a lot more about Almontes', both with regards to his post-conviction rehabilitation and his serious medical and physical deterioration due to the prison systems' indifference towards his medical needs and care, that it knew in 2006. And this allows the Court the confidence to sentence him in a way that conceivably is fairer than it was in 2007, Exhibit 12 (p. 36-37), and certainly more humane than the current sentence which (because of his medical issues and lack of care) is subjecting him to permanent injury.

Almontes has served his sentence commendably, as a model inmate. He was not sentence to permanent paralysis for the remainder of his life due to his custodian's indifference.

25

The First Step Act authorizes this Court to reduce Almontes' sentence to a more just term of imprisonment, one that may allow him to avoid permanent paralysis. Thus, we respectfully ask this Court to recognize that Almontes deserves mercy and redemption.

## CONCLUSION

For good cause having been shown the Court should grant Almontes' request motion to (1) reduce his sentence to time served based on the "extraordinary and compelling" reasons discussed below (2) expedite consideration due to the urgency of his medical needs (3) appoint counsel and (4) permit oral argument on this motion.

## VERIFICATION

I Rafael Almontes declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing assertions are true and correct to the best of my knowledge and belief.

_Rafael Almontes_

Rafael Almontes, pro se

Case No: 3:05-cr-58 (SRU)

## CERTIFICATE OF SERVICE

    I Rafael Almontes certify that a true and correct copy of the within motion, memorandum, and supporting exhibits was served upon counsel for the United States by the Court ECF system.


Dated: November 29, 2019


By _Rafael Almonte_____
    Rafael Almontes, pro se
    16296-014
    FCI Danbury
    33.5 Pembroke Road
    Danbury, Ct 06811