| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>RAFAEL ALMONTES | No. 3:05-cr-58 (SRU) |

# ORDER

On October 2, 2006, I sentenced the defendant, Rafael Almonte[1] ("Almonte"), to 262 months' imprisonment after Almonte pleaded guilty to a two-count Substitute Information charging him with (1) Conspiracy to Possess with Intent to Distribute and to Distribute 500 Grams or More of Cocaine (202 months),[2] and (2) Possession of a Firearm in Furtherance of a Drug Trafficking Offense (60 months).[3] *See* Substitute Information, Doc. No. 476; Judgment, Doc. No. 815. On December 4, 2019, Almonte made a *pro se* motion to reduce his sentence based on "extraordinary and compelling reasons" pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *See* Mot. to Reduce Sentence, Doc. No. 1493. On March 23, 2020, I held a telephonic hearing on Almonte's motion. *See* Min. Entry, Doc. No. 1514. For the following reasons, I **grant** Almonte's motion and reduce his sentence to time served.

**I.     Standard of Review**

The First Step Act of 2018 (the "FSA") amended the language of section 3582(c)(1)(A). Before the FSA, only the Director of the Bureau of Prisons (the "BOP") could make a motion for the court to reduce a defendant's sentence based on extraordinary and compelling reasons. It is

---

[1] Although this case's docket refers to the defendant as "Rafael Almontes," his correct name is "Rafael Almonte." *See* Supp. Mem. in Support of Mot. to Reduce Sentence, Doc. No. 1502, at 1 n.1; PSR, Doc. No. 1495-3; Gov't Opp'n, Doc. No. 1507. The Clerk is directed to amend the docket to reflect the defendant's correct name.
[2] In violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B).
[3] In violation of 18 U.S.C. § 924(c)(1).

widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release. *See, e.g.*, U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* i (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf ("[W]e found that the existing BOP compassionate release program has been poorly managed and implemented inconsistently, likely resulting in eligible inmates not being considered for release and in terminally ill inmates dying before their requests were decided."); Shon Hopwood, *Second Looks & Second Chances*, 41 Cardozo L. Rev. 83, 105–06 (2019); William W. Berry III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate Release*, 68 Md. L. Rev. 850, 868 (2009) (noting that, in the 1990s, 0.01 percent of inmates annually were granted compassionate release).

Congress passed the FSA against that backdrop. The FSA altered section 3582(c)(1)(A), in part, to increase the use of compassionate release. *See* 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018) (titling changes to section 3582(c)(1)(A) as "Increasing the Use and Transparency of Compassionate Release"). In particular, the FSA amended section 3582(c)(1)(A) to allow a defendant him- or herself to bring a motion for compassionate release. Section 3582(c) now reads, in relevant part:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case –
>
> > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility,[4] whichever is

---

[4] There is no dispute in this case that Almonte made such a demand and that 30 days has lapsed. *See* Req. for a Reduction in Sentence Mot., Ex. A to Supp. Mem. in Support of Mot. to Reduce Sentence, Doc. No. 1502-1 (indicating that Almonte made that request on October 15, 2019); Mot. to Reduce Sentence, Doc. No. 1493 (filed on December 4, 2019).

earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –

> (i) extraordinary and compelling reasons warrant such a reduction; . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

The applicable "policy statement[] issued by the Sentencing Commission" is contained in U.S.S.G. § 1B1.13, which reads, in relevant part:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable, the court determines that—
>
> (1)
>    (A) Extraordinary and compelling reasons warrant the reduction;
>
>    (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3146(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Two application notes to section 1B1.13 further elucidate the meaning of "extraordinary and compelling reasons." Application note three provides, simply, that rehabilitation of a defendant "is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13 cmt. n.3 (citing 28 U.S.C. § 994(t)). Application note one sets forth three specific examples of "extraordinary and compelling reasons" and also one catch-all

provision. The first example explains that an inmate's medical condition rises to the level of an extraordinary and compelling reason when:

> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is –
>
>> (I) suffering from a serious physical or mental condition,
>> (II) suffering from a serious functional or cognitive impairment, or
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 cmt. n.1(A). The other two specific examples in application note one regard defendants over the age of 65 (U.S.S.G. § 1B1.13 cmt. n.1(B)) and situations in which an inmate may be needed to care for his children or his spouse/partner (U.S.S.G. § 1B1.13 cmt. n.1(C)). *See id.* The catch-all provision, titled "Other Reasons," provides that extraordinary and compelling reasons also exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

The Sentencing Commission has not amended section 1B1.13 since Congress passed the FSA. Indeed, it could not because a quorum of the Sentencing Commission does not presently exist. As a result, some anachronisms within section 1B1.13 seem in tension with the FSA. In particular, courts note that two clauses in section 1B1.13—including the catch-all provision at U.S.S.G. § 1B1.13 cmt. n.1(D)—still require that the Director of the BOP be the one to bring a

motion for relief under section 3582(c)(1)(A). Of course, though, the FSA altered section 3582(c)(1)(A) directly and eliminated that requirement by allowing a defendant him- or herself to bring such a motion under certain circumstances.

Although the government argues otherwise,[5] nearly all district courts hold that—since the FSA's passage—section 1B1.13 is not binding but is, rather, helpful guidance. *See, e.g.*, *United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) ("[T]he Commission's failure to amend Guideline § 1B1.13 and related Commentary following the First Step Act does not preclude a court from acting on motions for sentence reductions or using the catch-all provision in Application Note 1(D)."); *United States v. Beck*, 2019 WL 2716505, at *5 (M.D.N.C. June 28, 2019); *United States v. Cantu*, 2019 WL 2498923, at *3–4 (S.D. Tex. June 17, 2019); *United States v. Maumau*, 2020 WL 806121, at *2 (D. Utah Feb. 18, 2020) (agreeing that "the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. 1B1.13 cmt. n.1(A)–(C) warrant granting relief"); *United States v. Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (referring to section 1B1.13 as "at least partly anachronistic"); *United States v. Rivernider*, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019); *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). I agree with the vast majority of district courts: I can consider whether reasons other than the inmate's medical condition, age, and family circumstances amount to an extraordinary and compelling reason to reduce that inmate's sentence.

In granting motions for reductions in sentence under section 3582(c)(1)(A), courts often rely on the three examples laid out in application note one. *See, e.g.*, *United States v. Bellamy*, 2019 WL 3340699, at *3–4 (D. Minn. July 25, 2019) (relying on an inmate's (A) medical

---

[5] *See* Gov't Opp'n, Doc. No. 1507, at 7–8 (citing *Dillon v. United States*, 560 U.S. 817, 819 (2010); 28 U.S.C. § 994(t)); *see also United States v. Lynn*, 2019 WL 3805349, at *3 (S.D. Ala. Aug. 13, 2019).

condition and (B) age). However, even when a case does not fit neatly into one of the three specific examples, many courts have relied on the fourth, catch-all provision to find "extraordinary and compelling reasons." *See, e.g.*, *United States v. Walker*, 2019 WL 5268752, at *2–3 (N.D. Ohio Oct. 17, 2019) (acknowledging that the inmate's "circumstances do not involve any of the specific reasons described . . . in § 1B1.13, Application Note 1(A)–(C)," but holding that the inmate was entitled to a reduction in sentence "under subsection (D) of the note," based on "other 'extraordinary and compelling reasons' not specifically articulated"); *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019).

## II. Background

### A. Factual Background

In late 2002, the Danbury Police Department began an investigation into the drug trafficking activities of Alex Luna. PSR, Doc. No. 1495-3, at ¶ 12. The Drug Enforcement Administration became involved in June 2004. *See id.* Luna was the leader of a large drug-dealing enterprise in Danbury, Connecticut (the "Luna Conspiracy") that sold both powder cocaine and crack cocaine. *See id.* at ¶¶ 13–19. Almonte's participation in the Luna Conspiracy was relatively low-level. *See id.* at ¶ 35 (noting that Almonte's participation involved between 500 grams and 2 kilograms of cocaine). Almonte was arrested on February 28, 2005. When the police attempted to apprehend Almonte, he fled in his vehicle and crashed into a concrete wall. *See id.* at ¶ 38. Almonte broke his neck in that collision, and he received spinal fusion surgery at Yale-New Haven Hospital. *See id.* at ¶ 85. The police found over 40 grams of cocaine and two guns in and around Almonte's car, as well as a 4.5-inch knife hanging on a chain around Almonte's neck. *See id.* at ¶¶ 38–39.

At the time of his arrest, Almonte had been convicted of three qualifying felony convictions; accordingly, he was categorized as a career offender under the Guidelines. *See id.* ¶¶ 40, 52.[6] (Indeed, Almonte had a lengthy criminal history. *See id.* at ¶¶ 55–63.) Thus, at his sentencing, even though Almonte's adjusted offense level would have been just 26 otherwise, his adjusted offense level jumped to 37. *See id.* at ¶ 52. With a reduction of three levels for acceptance of responsibility, Almonte's total offense level was 34. *See id.* at ¶¶ 53–54. Almonte faced fifteen years of imprisonment as a mandatory minimum, and Almonte's guidelines range at sentencing was, effectively, 322 to 387 months' imprisonment. *See id.* at ¶ 103.[7]

At an earlier time, Almonte was an honors student and had dreams of joining the United States Marine Corps. *See id.* at ¶¶ 79, 95. However, Almonte dropped out of high school. By the time he was arrested in this case, Almonte was addicted to both alcohol and cocaine—he was using "at least a gram or two [of cocaine] a day"—and he used marijuana regularly. *See id.* at ¶¶ 88–90. The probation officer summed up this case as follows:

> Rafael Almonte's case is in many ways unique, and is certainly tragic. His criminal record in no way reflects the young man who was once recognized for academic excellence, had the prospect of a college scholarship, and pursued service in the United States Marine Corps. In fact, his life went tragically astray from the promising future that was once within his grasp. For more than the past decade, he has struggled with his own cocaine addiction, which inevitably led to his involvement in drug trafficking as a way to support his daily habit.

*Id.* at ¶ 114.

In imposing sentence on Almonte, I noted that any substantial sentence would result in Almonte's release at an age old enough that it would be unlikely for Almonte to return to a life

---

[6] The three qualifying felony convictions were: (1) Criminal Possession of a Controlled Substance With Intent to Sell in August 1992; (2) Attempted Robbery in the Second Degree in February 1994; and (3) Assault in the First Degree in January 2002. *See* PSR, Doc. No. 1495-3, at ¶ 40.

[7] Almonte's guidelines range on Count One was 262 to 327 months' imprisonment, but Count Two required 60 months' imprisonment to run consecutively to any sentence imposed on Count One. *See* PSR, Doc. No. 1495-3, at ¶ 103.

7

of crime. *See* Sentencing Tr., Doc. No. 1493-3, at 4. In addition, I explained that Almonte—although he had a lengthy criminal history—had never been punished with imprisonment more than three years, and so whatever sentence I imposed would be many multiples of that. *See id.* at 6. I also explained to Almonte that, although his "role was not a minor role," "the level of [Almonte's] involvement was a street-level involvement," and Almonte was "motivated at least in part by [his] own drug addiction." *See id.* at 4, 6; *see also* Statement of Reasons, Doc. No. 1495-6, at 3.

B. Procedural Background

As noted above, on December 4, 2019 Almonte filed *pro se* a motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). *See* Mot. to Reduce Sentence, Doc. No. 1493. Following that, attorney Sarah French Russell appeared for Almonte, *see* Notice of Appearance, Doc. No. 1500, and, on February 24, 2020, filed a supplemental memorandum in support of Almonte's motion.[8] *See* Supp. Mem. in Support of Mot. to Reduce Sentence, Doc. No. 1502 ("Supp. Mem. in Support"). On March 9, 2020, the government filed an opposition. *See* Gov't Opp'n, Doc. No. 1507. On March 12, Almonte, through Attorney Russell, filed a reply. *See* Almonte's Reply, Doc. No. 1508. On March 17, the government filed sur-reply. *See* Gov't Sur-Reply, Doc. No. 1509. On March 23, 2020, I held a telephonic hearing in this matter and took Almonte's motion under advisement. *See* Min. Entry, Doc. No. 1510. Following the hearing, Almonte, through Attorney Russell, filed a further reply. *See* Almonte's Sur-Reply, Doc. No. 1515. The government filed another sur-reply. *See* Gov't 2d Sur-Reply, Doc. No. 1516. And

---

[8] Quinnipiac Law students Emily Barigye and Haley Paetzold assisted Attorney Russell in preparing the memorandum and also participated in the March 23 hearing. *See* Order, Doc. No. 1513.

8

Almonte, through Attorney Russell, filed two more sur-replies. *See* Almonte's 2d Sur-Reply, Doc. No. 1517; Almonte's 3d Sur-Reply, Doc. No. 1519.

### III. Discussion

Pursuant to 18 U.S.C. § 3582(c)(1)(A), I hold that extraordinary and compelling reasons warrant a reduction in Almonte's sentence and that such a reduction is consistent with U.S.S.G. § 1B1.13. In this case, a combination of factors add up to extraordinary and compelling reasons. *See* U.S.S.G. § 1B1.13 cmt. n.1(D). The first—most important—factor is medical: Almonte urgently needs serious spinal surgery. Almonte has begun to lose the ability to care for himself in prison: he has already fallen multiple times in 2020. Without spinal surgery as soon as possible, Almonte is in danger of becoming paralyzed. The second factor is Almonte's rehabilitation. Almonte has already served 15 years in prison—over three-quarters of his sentence—and his release date (with good time credit) is in late 2023 or early 2024.[9] Almonte has been a model inmate. The third factor is the more lenient treatment of Almonte's more culpable co-conspirators. Almonte is no longer a danger to the community. He has a release plan that will give him an excellent platform to reintegrate into society after his surgery and recovery. Finally, reducing Almonte's sentence to the time he has already served is consistent with the purposes of sentencing under 18 U.S.C. § 3553(a).

---

[9] *See* Find an Inmate, https://www.bop.gov/inmateloc/ (inserting Almonte's register number of 16296-014, the BOP estimates a release date of October 21, 2023); Supp. PSR, Doc. No. 1495, at 3 (reporting that the BOP estimates a release date of March 19, 2024).

A. A Sentence Reduction is Warranted.

   1. *Almonte's Medical Condition*

Several courts have granted motions for reduction in sentence because the inmate's medical condition constituted an extraordinary and compelling reason. In some of those cases, the inmate is near death. *See, e.g.*, *Ebbers*, 2020 WL 91399, at *6 (noting that, under application note 1(A), an inmate's medical condition rises to the level of an extraordinary and compelling reason when it is "a specific life-ending or debilitating illness with a predictable, dire short-term prognosis"); *United States v. Spears*, 2019 WL 5190877, at *1–2 (D. Or. Oct. 15, 2019) (terminal cancer patient). In other cases, when the inmate is not near death, the inmate is usually unable to provide care for himself and is not expected to recover from his particular affliction. *See, e.g.*, U.S.S.G. § 1B1.13 cmt. n.1(A)(ii); *Bellamy*, 2019 WL 3340699, at *3–4. The relevant inquiry is whether the inmate will recover under the circumstances as they are. *See United States v. Romero*, 2020 WL 364275, at *2–3 (W.D. Tex. Jan. 21, 2020) (holding that defendant, who was confined to a wheelchair from life-long polio and had recently "developed a mass on her left shoulder," suffered "from a severe medical condition where improvement or recovery is unlikely under current conditions").

At least one court has considered the BOP's indifference to an inmate's urgent medical needs as a factor contributing to an extraordinary and compelling reason for reducing the inmate's sentence. *See Beck*, 2019 WL 2716505, at *1. *Beck* is similar to this case. In *Beck*, the defendant discovered lumps in her breast and sought prompt medical attention. *See id.* at *2. However, the BOP delayed for months in: taking the inmate for imaging, scheduling consultations, having a biopsy, scheduling surgery, and more. *See id.* at *2, *7. During the delays in treatment, Beck's cancer spread from her left breast to her right breast and metastasized. *See id.* The court noted that the BOP's treatment of Beck was "grossly

inadequate" and "abysmal" and that "[a]bsent judicial oversight, she is unlikely to receive better treatment at FCI Aliceville going forward." *Id.* at *7.

Admittedly, Almonte's condition is not yet life-threatening, and Almonte does not claim that, so far, he has been entirely unable to care for himself in prison. However, Almonte's medical condition is extremely serious. Since 2005, Almonte has suffered from chronic pain and numbness in his neck and left arm arising from his broken neck and subsequent vertebrae fusion surgery. *See* Supp. Mem. in Support, Doc. No. 1502, at 21–22. Beginning in 2015, Almonte's condition began deteriorating. In May 2015, Almonte saw an orthopedic doctor who strongly recommended that Almonte see a spine specialist. *See id.* at 22. In June 2015, Almonte wrote that his pain was "relentless and it even robs me of sleep as it persists all day and all night 24hrs a day." Inmate Request, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 99. On July 30, 2015, Almonte was scheduled for an MRI, but it did not proceed because technicians lacked information regarding the implant that surgeons had put in Almonte's neck during his 2005 surgery. *See id.* at 85; Supp. Mem. in Support, Doc. No. 1502, at 23. Almonte got an x-ray instead.

Almonte did not receive an MRI until June 2018; that MRI revealed "severe central spinal stenosis . . . [and] chronic myelomalacia of the spinal cord." Radiology Report, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 120. In August 2018, Dr. Daniel Southern of OrthoConnecticut examined Almonte and concluded that Almonte had "[s]evere . . . spondylolisthetic stenosis" and "[c]ervical myelopathy." Orthopedic Report, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 28. Dr. Southern wrote: "The patient is in need of urgent surgical consult for [spinal] decompression." *Id.* On October 1, 2018, BOP clinical staff noted that the "plan" for Almonte's treatment was a "surgical decompression" and submitted an

11

"urgent" request for surgery to be "schedule[d] within 14 days." Administrative Note, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 12–13. On November 1, 2018, Almonte saw Dr. Frank Hermantin, a spine surgeon at OrthoConnecticut. Dr. Hermantin reported that Almonte was suffering from "[c]ervical spondylosis with stenosis" and "[c]ervical myelopathy." Orthopedic Report, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 35. Dr. Hermantin said that he "told [Almonte] that in order to correct his problems he would need a large cervical reconstruction" that "would require both anterior and posterior approaches for decompressing the spine." *Id.* Dr. Hermantin concluded: "The patient will consider his options." *Id.*

The parties dispute whether, following his November 1, 2018 appointment with Dr. Hermantin, Almonte actively pursued that reconstructive surgery. The government notes that Dr. Hermantin's note—"[t]he patient will consider his options"—and a lack of follow-up from Almonte indicate that it was Almonte, not the BOP, that delayed surgery. *See* Gov't Opp'n, Doc. No. 1507, at 5. On the other hand, Almonte argues that he agreed to surgery during his visit to Dr. Hermantin on November 1, 2018. *See* Supp. Mem. in Support, Doc. No. 1502, at 28–29; Almonte's Reply, Doc. No. 1508, at 5–9. On November 14, 2018—two weeks after his appointment with Dr. Hermantin—a BOP nurse wrote that Almonte would need a "follow-up after c-spine decompression." Administrative Note, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 4. Thus, at that time, it was plainly understood that Almonte would be getting spinal decompression surgery: there would no need to schedule a follow-up without a surgery. Throughout this period, Almonte avers that he was clear that he wanted the surgery and he let it be known; Almonte "repeatedly" asked the senior assistant health services officer at FCI Danbury when the surgery would occur. Almonte's Reply, Doc. No. 1508, at 7.

Still, the BOP never followed up on Almonte's referral for surgery from Dr. Hermantin. On January 7, 2019 a BOP doctor wrote that "decompression . . . is needed – per recommendation of orthopedics." Clinical Encounter, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 3. During a May 8, 2019 appointment, Dr. Southern noted that Almonte was "scheduled for surgical decompression." Orthopedic Report, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 21.[10] But no such surgery had been scheduled. On October 15, 2019, a BOP doctor noted: "Patient was supposed to have cervical surgery, but the referral was cancelled. It is not clear as to why he never saw [a] specialist." Clinical Encounter, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 40. By November 2019, Dr. Hermantin's referral had expired, and so the clock reset: Almonte now had to get a new consultation before any surgery could take place. *See* Almonte's Reply, Doc. No. 1508, at 8. That consultation was scheduled for March 30, 2020. *See id.* at 9. Although the government gave assurances that that appointment would proceed, it did not. *See* Gov't 2d Sur-Reply, Doc. No. 1516, at 1 (assurances); Almonte's 2d Sur-Reply, Doc. No. 1517, at 1 (reporting that the appointment did not proceed).

Almonte's condition is deteriorating. Almonte reports that he has begun losing control of his legs on occasion and falling. Almonte says that—although he fell just once before 2020—he has already fallen three times in 2020. *See* Supp. Mem. in Support, Doc. No. 1502, at 26–27. One recent fall occurred while Almonte was taking a shower. *See id.* at 27. In August 2018, Dr. Southern noted that Almonte had "difficulty tandem walking." Orthopedic Report, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 28. Because a symptom of cervical myelopathy is loss of balance and trouble walking,[11] if Almonte's condition is left untreated, those symptoms

---

[10] At that appointment, to address Almonte's increased levels of pain, Dr. Southern also administered an epidural injection. *See* Orthopedic Report, Ex. B to Supp. Mem. in Support, Doc. No. 1504, at 22.
[11] *See Cervical Myelopathy*, John's Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/cervical-myelopathy (last visited Apr. 9, 2020).

will worsen, and Almonte will soon be entirely unable to care for himself. Since August 2018—when Dr. Southern indicated that Almonte's spinal condition required "urgent" surgical treatment—Almonte has not received that treatment.

The foregoing illustrates that Almonte suffers from a serious physical condition that has begun to substantially diminish his ability to care for himself and from which—given the BOP's failure to address Almonte's condition—Almonte will not improve or recover under current circumstances. *Cf. Romero*, 2020 WL 364275, at *3; U.S.S.G. § 1B1.13 cmt. n.1(A)(ii). The BOP has been indifferent to Almonte's condition under normal circumstances, and there is no reason to think that that will change. *See* U.S. Dep't of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* 18 (Feb. 2016), https://oig.justice/gov/reports/2015/e1505.pdf (noting waitlists for inmates to see outside specialists and reporting as 114 days the average wait time at one facility). In fact, the BOP's indifference will almost surely get worse: With the current threat of COVID-19, there is little hope that Almonte will promptly get the attention that he needs.

   2. *Almonte's Rehabilitation*

In considering whether to grant a motion for a reduction in sentence pursuant to section 3582(c)(1)(A), a court may consider an inmate's rehabilitation, but rehabilitation alone is not an "extraordinary and compelling" reason warranting a reduction. *See* U.S.S.G. § 1B1.13 cmt. n.3; 28 U.S.C. § 994(t); *United States v. Cantu-Rivera*, 2019 WL 2578272, at *2 (S.D. Tex. June 24, 2019) (recognizing "extraordinary degree of rehabilitation" as one of a "combination of factors" amounting to an extraordinary and compelling reason to reduce sentence). Almonte argues that his rehabilitation has been "extraordinary and compelling." *See* Supp. Mem. in Support, Doc. No. 1502, at 29. Almonte points out that during his more than 15 years of incarceration, he has

taken advantage of educational, vocational, and leadership opportunities, including working for over eight years for UNICOR.  *See id.* at 29–35.  In addition, Almonte has paid in full the special assessment of $200 and fine of $2000 that I imposed on him at sentencing.  *See id.* at 31.  Almonte has maintained close family relationships throughout his incarceration.  *See id.* at 33 (describing visits).  And during his incarceration, Almonte has had only one minor disciplinary infraction for possession of an unauthorized item and smoking in an unauthorized area.  *See* Supp. PSR, Doc. No. 1495, at 3; Supp. Mem. in Support, Doc. No. 1502, at 30 (Almonte claims the unauthorized item was tobacco).

The government acknowledges Almonte's achievements but suggests that they do not amount to an "extraordinary and compelling" reason to reduce Almonte's sentence.  *See* Gov't Sur-Reply, Doc. No. 1509, at 1–2; *see also United States. v. Sapp*, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020) ("[T]he Court commends Sapp on his record of good behavior and on his holding a prison job, but the Court does not believe that those factors are so unusual as to justify compassionate release.").

Almonte's success in prison is commendable and indicates that Almonte is a much better man today than he was when I sentenced him in 2006.  Although no level of rehabilitation, by itself, rises to the level of an "extraordinary and compelling reason" warranting a reduction in sentence, Almonte's rehabilitation certainly counts heavily in his favor.  *See, e.g.*, *Cantu-Rivera*, 2019 WL 2578272, at *2; *Bucci*, 409 F. Supp. at 2.

Related to Almonte's rehabilitation is his detailed plan for reintegration and the strength of his support network.  Three of Almonte's sisters and four of his cousins wrote to me in his support, and they all detailed their admiration for Almonte.  *See* Letters, Ex. F to Supp. Mem. in Support, Doc. No. 1502-6.  Almonte's counsel reports that, if Almonte is released, Almonte will

live with one of his sisters, who is adding an extra bedroom to her house for Almonte. *See* Supp. Mem. in Support, Doc. No. 1502, at 34. In addition, Almonte's brother-in-law has assured me that—once Almonte has recovered from surgery—Almonte will work for him as a painter in a large apartment complex in Danbury. *See* Letter, Ex. G to Supp. Mem. in Support, Doc. No. 1502-7. Almonte's family and his counsel have represented that they will help Almonte enroll in HUSKY D—Connecticut's Medicaid insurance program—and obtain the spinal surgery that he so badly needs. *See* Supp. Mem. in Support, Doc. No. 1502, at 24; Almonte's Reply, Doc. No. 1508, at 4.

3. *Almonte's Role in the Luna Conspiracy*

Some courts have considered intervening changes in law as factors contributing to an "extraordinary and compelling" reason for a sentence reduction under section 3582(c)(1)(A). *See, e.g.*, *Maumau*, 2020 WL 806121, at *5 (remarking that "the fact that [the defendant] would not receive the same sentence if the crime occurred today" contributed to "extraordinary and compelling grounds to reduce his sentence"). Almonte argues that the *inapplicability* to him of the FSA's retroactive crack cocaine penalty reduction provision is unfair. *See* Supp. Mem. in Support, Doc. No. 1502, at 35–39. That is, Almonte was convicted as a part of the Luna Conspiracy, which dealt in both powder cocaine and crack cocaine.

Twenty-two defendants were indicted as part of the Luna Conspiracy, and Almonte—who received the third-longest sentence among the co-conspirators—is the only defendant not to have been released from prison or to have been eligible for a reduction in sentence. *See id.* at 37–38. In particular, the two defendants who received sentences longer than Almonte's—Bobby Medina and Alex Luna—were the two leaders of the Luna Conspiracy. Medina and Luna were eligible for relief under the part of the FSA that made retroactive portions of the Fair Sentencing

16

Act of 2010 that reduced the sentencing disparity between crack cocaine and powder cocaine offenses. *See United States v. Luna*, 2020 WL 464778, at *2 (D. Conn. Jan. 29, 2020) (explaining that interplay). Put simply, because Medina and Luna were convicted of offenses involving crack cocaine, the FSA allowed me to resentence them on all their counts of conviction. *See id*. at *2–8 (explaining my reasoning). I resentenced Medina to time served after 14 years in prison, and Luna's resentencing is forthcoming.

Almonte is not eligible for the same relief under the FSA because Almonte pled guilty to only a powder cocaine offense. Almonte argues that that difference—which Almonte seems to equate to a technicality—is fundamentally unfair because Almonte was less culpable than were Medina and Luna. The government concedes that Almonte was less culpable than were Medina and Luna. *See* Gov't Sur-Reply, Doc. No. 1509, at 2. However, the government explains that the discrepancy between Almonte, on the one hand, and Medina and Luna, on the other hand, is not unfair because Almonte's lengthy sentence was based mostly upon his criminal history and his status as a career offender, and no intervening change in the law affects that. *See id.* at 2–3.

Although not a significant factor in my decision, it is notable that, without relief, Almonte is set to serve the longest sentence of all the Luna Conspiracy defendants.[12] I noted several factors at Almonte's sentencing that led me to depart downwards from Almonte's applicable guidelines range. Among those was the fact that Almonte was less culpable than were the leaders of the Luna Conspiracy. I remarked that, although Almonte's "role was not a minor role," "the level of [Almonte's] involvement was a street-level involvement," and Almonte was "motivated at least in part by [his] own drug addiction." *See* Sentencing Tr., Doc. No. 1493-3, at 4, 6. Almonte's role in the Luna Conspiracy has not changed since the offense conduct.

---

[12] Of course, this depends on the outcome of Luna's resentencing, which will take place soon.

However, the world and the legal landscape has changed, allowing numerous of Almonte's co-conspirators to benefit from a reduction in sentence. That Almonte has not had such an opportunity certainly does not rise to the level of an "extraordinary and compelling" reason to reduce his sentence, but it is a relevant consideration.

    4. *Combination of Factors*

As the foregoing illustrates, a combination of factors convinces me that there are extraordinary and compelling reasons to reduce Almonte's sentence. Almonte's medical condition may alone amount to an extraordinary and compelling reason to do so because his cervical myelopathy is a serious physical condition that will soon leave Almonte unable to care for himself in prison. If Almonte does not get the surgery he needs, he will not recover from his condition.[13] If he remains in BOP's custody, Almonte will not get the surgery quickly enough. The surgery has already slipped through the cracks for a year and a half, and there is little chance for any improvement, given the rise of COVID-19 and concomitant logistical complications. Further, Almonte's rehabilitation from his former life of crime has been total, and he has a supportive network of family ready to help him reintegrate into society. Finally, because of changes in the law that did not affect him, Almonte's more culpable co-conspirators have been afforded leniency while Almonte has not.

  B. <u>Almonte's Sentence is Reduced to Time Served.</u>

As described above, to reduce Almonte's sentence under section 3582(c)(1)(A), I must find that (1) extraordinary and compelling reasons warrant a reduction; (2) such a reduction is

---

[13] *Cervical Myelopathy*, John's Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/cervical-myelopathy (last visited Apr. 9, 2020) ("Cervical myelopathy is best treated with spine decompression surgery.")

consistent with section 1B1.13; and (3) any reduced sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a).

1. *Extraordinary and Compelling Reasons*

I have already explained above why extraordinary and compelling reasons warrant a reduction in Almonte's sentence.

2. *Consistent with Section 1B1.13*

I have also already explained above why reducing Almonte's sentence is consistent with the Sentencing Commission's policy statement as outlined in section 1B1.13. Almonte is not a danger to the safety of any other person or to the community for all the reasons already discussed and those discussed below in addressing the 3553(a) factors. *See* U.S.S.G. § 1B1.13(2); 18 U.S.C. § 3142(g).

3. *Section 3553(a) Factors*

Pursuant to 18 U.S.C. § 3553(a), any sentence I impose must be sufficient, but not greater than necessary, to comply with the purposes of sentencing. A sentence of time served in this case is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Almonte has served over 15 years in prison for distributing between 500 grams and 2 kilograms of cocaine. That period of incarceration more than adequately reflects the seriousness of Almonte's offense, promotes respect for the law, provides adequate deterrence to Almonte and others, and protects the public from further of Almonte's crimes.

For many of the reasons already listed above, any more time that Almonte spends incarcerated will be greater than necessary to comply with the purposes of sentencing. Almonte has fully rehabilitated himself in prison and is poised to become a productive member of society.

Almonte has a chance at saving his physical health only if he is released from prison. After he obtains the surgery that he needs and recovers, Almonte is unlikely to re-offend. He is currently 47 years old,[14] and there is every likelihood that Almonte will live the rest of his life as a productive member of society. Almonte has plans first to become a painter for his brother-in-law. *See* Letter, Ex. G to Supp. Mem. in Support, Doc. No. 1502-7. Eventually, if Almonte recovers well, Almonte aspires to becoming a personal trainer. *See* Supp. Mem. in Support, Doc. No. 1502, at 32.

**IV. Conclusion**

For the foregoing reasons, I **grant** Almonte's motion for a reduction in sentence, doc. no. 1493. In addition, Almonte's motions for leave to proceed *in forma pauperis*, doc. no. 1494, and for a copy of the docket, doc. no. 1497, are **denied as moot**.

The Bureau of Prisons is directed to immediately commence the process of releasing Almonte from custody. Upon release, Almonte will immediately begin serving his term of supervised release.

IT IS SO ORDERED.

Dated at Bridgeport, Connecticut, this 9th day of April, 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

---

[14] *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 28 (May 2004), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (finding that offenders aged 41 to 50 have an average recidivism rate of 12.7 percent).